# In the United States Court of Appeals for the Eighth Circuit

JAMES HESS,
*Plaintiff-Appellant,*

v.

UNION PACIFIC RAILROAD CO.,
*Defendant-Appellee.*

On Appeal from the United States District Court
for the District of Nebraska
Case No. 8:23-cv-00205-RFR-CRZ (The Hon. Richard F. Rossiter, Jr.)

## BRIEF OF PLAINTIFF-APPELLANT

JAMES H. KASTER
LUCAS J. KASTER
NICHOLS KASTER, PLLP
4700 IDS Center
80 South 8th Street
Minneapolis, MN 55402
(612) 256-3200

MATTHEW W.H. WESSLER
GUPTA WESSLER LLP
2001 K Street, NW
Suite 850 North
Washington, DC 20006
(202) 888-1741
*matt@guptawessler.com*

JESSICA GARLAND
GUPTA WESSLER LLP
505 Montgomery Street, Suite 625
San Francisco, CA 94111
(415) 573-0336

April 12, 2024

*Counsel for Plaintiff-Appellant*

**SUMMARY OF THE CASE AND REQUEST FOR ORAL ARGUMENT**

James Hess respectfully requests an opportunity to present oral argument in this appeal. This case presents an important issue central to Rule 23 class-action practice: When all parties in a putative class action recognize that a certain plaintiff is included in the class, and it is objectively reasonable for that plaintiff to rely on the class to protect his interests, must that plaintiff nonetheless file his own individual action to prevent his claim from being time-barred in the event that a certified class is later decertified? *See Am. Pipe & Constr. Co. v. Utah*, 414 U.S. 538, 554 (1974) (explaining that the filing of a class-action complaint "suspends the applicable statute of limitations as to all asserted members of the class who would have been parties had the suit been permitted to continue as a class action" because such a filing supplies a defendant with all the "essential information" it needs to defend itself against those claims); *Crown, Cork & Seal Co. v. Parker*, 462 U.S. 345, 349 (1983) (explaining that a contrary rule would "frustrate[]" the "principal purposes of the class action procedure"). Argument will assist the Court in resolving this important legal issue.

For these reasons, Mr. Hess requests 15 minutes of oral argument.

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Fed. R. App. P. 26.1, James Hess makes the following required disclosures:

1. Is said party a subsidiary or affiliate of a publicly owned corporation? **No.**

2. Is there a publicly owned corporation, not a party to the appeal, that has a financial interest in the outcome? **No.**

April 12, 2024

*/s/ Matthew W.H. Wessler*
Matthew W.H. Wessler

# TABLE OF CONTENTS

Table of authorities ................................................................................ v

Introduction .............................................................................................. 1

Jurisdictional statement ......................................................................... 4

Statement of the issue ............................................................................. 4

Statement of the case .............................................................................. 5

    A.    Mr. Hess performs his duties without incident until Union Pacific, under its fitness-for-duty program, decides that his Xanax prescription precludes him from doing his job ..........................5

    B.    The *Harris* class action represents more than 7,000 Union Pacific employees, Mr. Hess among them...............................................7

    C.    Shortly after the decertification of the *Harris* class, Mr. Hess files his own EEOC charge and his own ADA action ................................ 16

Summary of argument...............................................................................21

Standard of review ...................................................................................24

Argument ..................................................................................................24

    I.    Under *American Pipe*, Mr. Hess's suit is timely......................................24

    A.    For the last fifty years, *American Pipe* has entitled putative class members to the tolling of the statute of limitations on their claims until and unless the class is decertified....................24

    B.    Mr. Hess's suit is timely because he was entitled to *American Pipe* tolling as a member of the *Harris* class....................28

    II.    The district court's contrary logic distorts *American Pipe* tolling beyond all recognition.........................................................................36

A.  The court below failed to recognize that the *Harris* district court defined the certified class to include Mr. Hess and those like him ..............................................................38

B.  *American Pipe* tolling extends as far as an absent class member could reasonably rely on the class action to preserve his rights, and here the district court and parties represented that Mr. Hess remained part of the class until decertification.......................................................... 41

C.  The district court's reasoning unavoidably conflicts with the core objectives of the doctrine...............................................47

Conclusion ................................................................................. 49

# TABLE OF AUTHORITIES

**Cases**

*Adams Public School District v. Asbestos Corp.,*
    7 F.3d 717 (8th Cir. 1993) ................................................................. 27

*American Pipe & Construction Company v. Utah,*
    414 U.S. 538 (1974) ................................................................... *passim*

*Anderson v. Unisys Corp.,*
    47 F.3d 302 (8th Cir. 1995) ......................................................... 28, 38

*Arch of Kentucky, Inc. v. Director, Office of Workers' Compensation Programs,*
    556 F.3d 472 (6th Cir. 2009) ............................................................. 25

*Armstrong v. Martin Marietta Corp.,*
    138 F.3d 1374 (11th Cir. 1998) .......................................................... 43

*Barryman-Turner v. District of Columbia,*
    115 F. Supp. 3d 126 (D.D.C. 2016) ..................................................... 37

*Blankinship v. Union Pacific,*
    No. 22-16849 (9th Cir.) ................................................................... 21

*Bridges v. Department of Maryland State Police,*
    441 F.3d 197 (4th Cir. 2006) .............................................. 28, 37, 42, 43

*Burnett v. New York Central Railroad Co.,*
    380 U.S. 424 (1965) ..................................................................... 25, 26

*California Public Employees' Retirement System v. ANZ Securities, Inc.,*
    582 U.S. 497 (2017) ....................................................................... 25

*China Agritech, Inc. v. Resh,*
    584 U.S. 732 (2018) .................................................................... 25, 41

*Crown, Cork & Seal Co. v. Parker,*
    462 U.S. 345 (1983) ................................................................... *passim*

*DeFries v. Union Pacific,*
    No. 23-35119 (9th Cir.) .................................................................. 21

*DeGeer v. Union Pacific,*
No. 23-2625 (8th Cir.)......................................................................21

*Donahue v. Union Pacific,*
No. 22-16847 (9th Cir.)...................................................................21

*Giovanniello v. ALM Media, LLC,*
726 F.3d 106 (2d Cir. 2013) ............................................................43

*Great Plains Trust Co. v. Union Pacific Railroad Co.,*
492 F.3d 986 (8th Cir. 2007) ...........................................................48

*Harris v. Union Pacific Railroad Co.,*
329 F.R.D. 616 (D. Neb. 2019) .............................................*passim*

*Harris v. Union Pacific Railroad Co.,*
953 F.3d 1030 (8th Cir. 2020)........................................... 5, 7, 15

*Kelly v. City of Omaha, Nebraska,*
813 F.3d 1070 (8th Cir. 2016) ..................................................... 24, 35

*McCaffree Financial Corp. v. Principal Life Insurance Co.,*
811 F.3d 998 (8th Cir. 2016) ..........................................................35

*Menhorn v. Firestone Tire & Rubber Co.,*
738 F.2d 1496 (9th Cir. 1984)........................................................25

*Odle v. Wal-Mart Stores, Inc.,*
747 F.3d 315 (5th Cir. 2014) .........................................................27

*Potter v. Commissioner of Social Security,*
9 F.4th 369 (6th Cir. 2021) ...........................................................43

*Sawtell v. E.I. du Pont de Nemours & Co.,*
22 F.3d 248 (10th Cir. 1994)..........................................................42

*Smith v. Pennington,*
352 F.3d 884 (4th Cir. 2003) ....................................................27, 43

*Taylor v. United Parcel Service, Inc.,*
554 F.3d 510 (5th Cir. 2008).........................................................42

*Trooien v. Mansour,*
  608 F.3d 1020 (8th Cir. 2010) ................................................................24

*Vaught v. Showa Denko K.K.,*
  107 F.3d 1137 (5th Cir. 1997) ...............................................................34

*Zaragoza v. Union Pacific,*
  No. 23-50194 (5th Cir.) ......................................................................21

*Zarecor v. Morgan Keegan & Co.,*
  801 F.3d 882 (8th Cir. 2015) ................................................................45

**Statutes**

28 U.S.C. § 1291 ......................................................................................... 4

28 U.S.C. § 1331 ......................................................................................... 4

42 U.S.C. § 12101 ........................................................................................ 4

42 U.S.C. § 12112 ............................................................................. 7, 16, 18

**Other Authorities**

Fed. R. Civ. P. 23 ......................................................................................38

## INTRODUCTION

Nearly fifty years ago, the U.S. Supreme Court in *American Pipe & Construction Company v. Utah*, 414 U.S. 538 (1974), set out an important bright-line tolling rule. Whenever a class action is filed, the statute of limitations is tolled as to all asserted members of the class—until or unless class certification is denied or the class members receive notice of class certification and decide to opt out. That rule, the Court explained, serves the twin aims of a limitations period, on the one hand, and of Federal Rule of Civil Procedure 23, on the other: It ensures that defendants have notice of the nature and scope of the claims against them, and it spares the litigation system from the repetitious filings of class members attempting to preserve their claims.

That rule should have been applied here. In 2016, a group of Union Pacific employees commenced a class action against the company in a case called *Harris v. Union Pacific Railroad Company*. In that case, the plaintiffs alleged that the railroad discriminated against workers with disabilities in violation of the Americans with Disabilities Act by routing workers suspected of various health conditions into its "fitness-for-duty" program, where it applied restrictive criteria to bar them from jobs they had previously performed without issue. James Hess was one such worker. After serving in the military, Mr. Hess worked for Union Pacific for almost four years as an installation technician. He performed his duties safely and effectively throughout

that period. But in 2017, when Union Pacific learned that he was taking Xanax for post-traumatic stress disorder, Union Pacific subjected him to its new fitness-for-duty procedures: It suspended him from work without pay, imposed further evaluation, and, ultimately, barred him from working for the company.

Throughout the *Harris* litigation, both the parties and the district court consistently recognized that Mr. Hess, and other workers like him, were members of the class. Union Pacific included him on a list meant to encompass those workers who were part of the class. The district court recognized that those on that list were "class members" in its decision certifying the class. And, once the class was certified, the court ordered that notice be sent to everyone on that list and in the class—including Mr. Hess. The district court also held that the claims of each of the six named plaintiffs were "typical of the class" and "arise[] from the same event or course of conduct as the class claims." *Id.* at 624. One of those named plaintiffs, Mr. Zinn, asserted he was sent to a fitness-for-duty-exam for the *same reason* as Mr. Hess—because Union Pacific discovered he was taking Xanax. *See* App. Vol. 1 at 65–66, R. Doc. 8-1, at 15–16. And when Union Pacific challenged the class certification decision in a previous appeal to this Court, it used the inclusion of workers like Mr. Zinn as an illustration of the problems with class treatment.

But after Union Pacific persuaded this Court to decertify the class, the company promptly changed its tune. Having left Mr. Hess and those like him with

2

no choice but to pursue their own individual cases, Union Pacific turned around and asserted that it was too late. For the first time, it claimed that many of the workers on the class list had in fact not been members of the certified *Harris* class and thus their individual claims were now time-barred.

The district court in Mr. Hess's individual case agreed. But to reach that conclusion, the court distorted the *American Pipe* tolling rule beyond all recognition. It set aside what everyone in *Harris* had actually told absent class members about who was in the class. Instead, the district court here opted to parse the definition of the class the plaintiffs sought to certify to come up with its own preferred understanding. That post-hoc reasoning excluded Mr. Hess, thereby depriving him of tolling.

This approach to *American Pipe* tolling is unprecedented, and no authority supports it. For good reason: Left to stand, the district court's decision subverts the purposes of the doctrine altogether, requiring acknowledged class members to file repetitious filings to guard against the risk that some later court, separated in time and space from the class litigation, will misunderstand the class and deem class members to be excluded from it. And that fear would be well founded because that is exactly what happened here. Everyone in *Harris* repeatedly affirmed that Mr. Hess was a class member—and thus was entitled to tolling—yet the district court here

rejected that common understanding. This Court should reverse the district court's error.

## JURISDICTIONAL STATEMENT

The district court had subject-matter jurisdiction under 28 U.S.C. § 1331 because this action arises under the federal Americans with Disabilities Act, 42 U.S.C. §§ 12101 *et seq.*; App. Vol. 1 at 1, R. Doc. 1, at 1. This Court has jurisdiction over the appeal under 28 U.S.C. § 1291 because the district court granted final judgment to the defendant on all claims. App. Vol. 2 at 604, R. Doc. 18, at 7; App. Vol. 2 at 606, R. Doc. 19.

The district court entered its order granting Union Pacific's motion to dismiss on January 10, 2024. App. Vol. 2 at 606, R. Doc. 19; App. Vol. 2 at 599–605, R. Doc. 18. Mr. Hess timely filed a notice of appeal under Federal Rule of Appellate Procedure 4(a)(1)(A) on February 2, 2024. *See* App. Vol. 2 at 607, R. Doc. 20, at 1.

## STATEMENT OF THE ISSUE

Did the district court err in refusing to apply *American Pipe* tolling and holding instead that Mr. Hess's Americans with Disabilities Act claims were time-barred even though he was a member of a previous class action that raised the same claims?

Apposite cases on this issue include *American Pipe & Construction Company v. Utah*, 414 U.S. 538 (1974), *Crown, Cork & Seal Co. v. Parker*, 462 U.S. 345 (1983), and *Harris v.*

*Union Pac. R.R. Co.*, 329 F.R.D. 616 (D. Neb. 2019), *reversed*, 953 F.3d 1030 (8th Cir. 2020). There are no apposite statutory or constitutional provisions.

**STATEMENT OF THE CASE**

**A.     Mr. Hess performs his duties without incident until Union Pacific, under its fitness-for-duty program, decides that his Xanax prescription precludes him from doing his job.**

Union Pacific hired James Hess, a military veteran, in May 2013. App. Vol. 1 at 8, R. Doc. 1, at 8. Mr. Hess started as an installation technician, installing wires, cables, and other communication equipment, and then was promoted to lead installation technician for Union Pacific. App. Vol. 1 at 8, R. Doc. 1, at 8. Throughout his time with the company, Mr. Hess performed his job safely and without incident. App. Vol. 1 at 2, R. Doc. 1, at 2. And when, in May 2015, his doctor prescribed Xanax for Mr. Hess's anxiety and post-traumatic stress disorder, that did not change. App. Vol. 1 at 8, R. Doc. 1, at 8.

But although his treatment did not change his ability to do his job, Union Pacific implemented policies that prevented him from working. Beginning in 2014, the company made dramatic changes to its internal "Fitness-for-Duty" program, deciding that employees suspected of having certain medical or physical conditions should be suspended from work without pay, required to undergo further evaluation, and, frequently, restricted altogether from work with the company. App. Vol. 1 at 52, R. Doc. 8-1, at 2. As part of that policy, in 2016 Union Pacific created a list of

medications employees were restricted from taking. App. Vol. 1 at 58, R. Doc. 8-1, at 8. Xanax, a Benzodiazepine, was on that list. App. Vol. 1 at 8, R. Doc. 1, at 8.

So when, in January 2017, Union Pacific learned that Mr. Hess was taking Xanax, the company triggered the Fitness-for-Duty process: it immediately suspended him without pay and initiated a Fitness-For-Duty evaluation. App. Vol. 1 at 3–4, 8, R. Doc. 1, at 3–4, 8.

Months later, Mr. Hess's medical provider made clear that his prescription did not prevent Mr. Hess from returning to work. As his treating practitioner explained, Mr. Hess "is stable, showing no signs of cognitive or physical function impairment nor is he having any side effects." App. Vol. 1 at 8, R. Doc. 1, at 8. And they determined that he was able to return to work with no restrictions. App. Vol. 1 at 8, R. Doc. 1, at 8. Union Pacific ignored this medical determination. Although no doctor affiliated with Union Pacific ever physically examined Mr. Hess, the company nevertheless reached the opposite conclusion and, on March 16, 2018, placed him on permanent work restrictions that, the company said, "could not be accommodated." App. Vol. 1 at 8–9, R. Doc. 1, at 8–9.[1]

---

[1] Unless otherwise noted, all quotations in this brief omit internal brackets, emphases, ellipses, and citations.

**B.** **The *Harris* class action represents more than 7,000 Union Pacific employees, Mr. Hess among them.**

**1.** Unfortunately, Mr. Hess's experience was not unique. Since 2014, thousands of Union Pacific employees have, on account of the company's misgivings about their health, been automatically excluded from their jobs, evaluated under strict fitness-for-duty criteria, and, often, barred from their positions altogether. App. Vol. 1 at 1–2, R. Doc. 1, at 1–2. In 2016, several employees made these practices the subject of a class-action lawsuit against Union Pacific, bringing disparate-treatment and disparate-impact claims under the Americans with Disabilities Act (ADA). *Harris v. Union Pac. R.R. Co.*, 329 F.R.D. 616, 620–23 (D. Neb. 2019). They argued that the company discriminated against employees with disabilities and perceived disabilities in violation of the Americans with Disabilities Act in a variety of ways, including because its fitness-for-duty policies screened individuals with disabilities out of its workforce "even though [] they had no trouble fulfilling the essential functions of their jobs." *Harris v. Union Pac. R.R. Co.*, 329 F.R.D. 616, 620–23 (D. Neb. 2019), *reversed*, 953 F.3d 1030 (8th Cir. 2020); *see* 42 U.S.C. §§ 12112(a), (b)(6).

The *Harris* plaintiffs centered their claims on the changes Union Pacific made to its fitness-for-duty program beginning in 2014. At that time, Union Pacific decided that workers with a wide range of medical conditions posed an "unacceptable" safety risk to the company and tasked a small cadre of doctors and nurses with implementing standardized, automatic policies to screen those workers out of many

of the company's roles. App. Vol. 1 at 3–4, R. Doc. 1, at 3–4; *Harris*, 329 F.R.D. at 620 n.2, 623. To identify whom to target, the company drafted a written document that required workers to disclose any "Reportable Health Event[]"—"any new diagnosis, recent event[], and/or change" for a list of conditions. App. Vol. 1 at 3, R. Doc. 1, at 3.

But Union Pacific did not limit its fitness-for-duty program only to the specific criteria set forth in the written document. As the company's Chief Medical Officer, Dr. Holland, testified, the company's policy for what qualified as "reportable health events" was in practice broader than "what this section [in the company's medical rules] says." App. Vol. 1 at 147–49, R. Doc. 13-1, at 11–13. For example, despite the way the medical rules defined the term, a "reportable" health event was not required to be "new" or "recent" in the sense that Union Pacific didn't know about it previously. App. Vol. 1 at 147–49, R. Doc. 13-1 at, 11–13; *see also, e.g.*, App. Vol. 1 at 58–59, R. Doc. 8-1, at 8–9 (shifting treatment of a longstanding epilepsy diagnosis). "Sometimes" Union Pacific even uncovered a reportable health event just by looking back into an employee's medical files. App. Vol. 1 at 151, R. Doc. 13-1, at 15. Nor were "reportable health events" actually limited to what employees reported about themselves— employees could also get sent to a fitness-for-duty evaluation based on observations of their fellow co-workers or supervisors. App. Vol. 1 at 146, R. Doc. 13-1, at 10.

And when a worker disclosed such an event or condition (or if Union Pacific learned about one on its own), they were routed into the fitness-for-duty program just like anyone else. App. Vol. 1 at 1–4, R. Doc. 1, at 1–4. That meant they were suspended from work and underwent a fitness-for-duty evaluation during which the company's medical team collected information about the worker and made a final judgment about whether they would be permitted to perform their role. App. Vol. 1 at 7, R. Doc. 1, at 7. The result, the *Harris* plaintiffs alleged, was that a large group of Union Pacific employees who were "qualified and performing their jobs with no problems" were nonetheless "pulled from their jobs" and left with no recourse. *Harris*, 329 F.R.D. at 620.

**2.** At the outset of the *Harris* litigation, the plaintiffs asserted ADA claims on behalf of a class defined as follows:

> Individuals who were removed from service over their objection, and/or suffered another adverse employment action, during their employment with Union Pacific for reasons related to a Fitness-for-Duty evaluation at any time from 300 days before the earliest date that a named Plaintiff filed an administrative charge of discrimination to the resolution of this action.

App. Vol. 1 at 67, R. Doc. 8-1, at 17.

And as discovery got underway, that's who the plaintiffs asked Union Pacific to identify. *See* App. Vol. 1 at 174–75, R. Doc. 13-3, at 15–16. But Union Pacific refused, objecting to that request "as overly broad, unduly burdensome, and beyond the scope of discovery" "to the extent it seeks information regarding Fitness-for-Duty

evaluations other than those involving Reportable Health Events." App. Vol. 1 at 276–78, R. Doc. 13-5, at 13–16; App. Vol. 1 at 261–62, R. Doc. 13-4, at 4–5; *see* App. Vol. 1 at 172–78, 190–195, 220, 229, 234, 250–54, R. Doc. 13-03, at 13–19, 32–37, 62, 71, 76, 92–96. The company claimed that the class would be unwieldy and overinclusive—potentially reaching hundreds of thousands of employees—if it required only a fitness-for-duty evaluation, without being in some way tied back to the company's concept of a "Reportable Health Event." App. Vol. 1 at 275, R. Doc. 13-5, at 13; App. Vol. 1 at 261, R. Doc. 13-4, at 5; App. Vol. 1 at 155–57, R. Doc. 13-2, at 3–5. And, Union Pacific insisted, such a broad definition was unnecessary because "all the factual allegations pled and the Named Plaintiffs' claims revolve around fitness-for-duty evaluations that were initiated because of a Reportable Health Event." App. Vol. 1 at 155–57, R. Doc. 13-2, at 3–5. As a result, Union Pacific suggested that the class should encompass only those workers who "were subject to a Fitness for Duty Evaluation related to" such a "Reportable Health Event." App. Vol. 1 at 275, R. Doc. 13-5, at 13; App. Vol. 1 at 261, R. Doc. 13-4, at 5; App. Vol. 1 at 155–157, R. Doc. 13-2, at 3–5.

The case proceeded on this understanding. When asked to "identify all employees" who would "fall within" the "putative class[]," Union Pacific noted that it would do so based on its understanding of who the class included. App. Vol. 1 at 276, 278, R. Doc. 13-5, at 13, 16; App. Vol. 1 at 260–61, R. Doc. 13-4, at 4–5. Accordingly,

Union Pacific produced a series of spreadsheets listing current or former Union Pacific employees, with each new spreadsheet adding additional names. App. Vol. 1 at 275–78, R. Doc. 13-5, at 13–16. On July 7, 2017, Union Pacific produced a list that included Mr. Hess. App. Vol. 1 at 275, R. Doc. 13-5, at 13; App. Vol. 1 at 284, R. Doc. 13-6, at 382. Union Pacific described that list as "identifying 6,290 current or former Union Pacific employees who were subject to a Fitness for Duty Evaluation related to a Reportable Health Event." App. Vol. 1 at 275, 278, R. Doc. 13-5, at 13, 16. And on February 26, 2018, Union Pacific applied its understanding of a "Reportable Health Event" restriction to produce an expanded spreadsheet of 7,723 current or former Union Pacific employees. App. Vol. 1 at 275–78, R. Doc. 13-5, at 13–16. This list, too, included Mr. Hess. App. Vol. 1 at 287, R. Doc. 13-8, at 133.[2]

When, not long thereafter, the plaintiffs moved to certify a class, they made crystal-clear that the class they had in mind included each of the "more than 7,000" Union Pacific employees the company had identified. App. Vol. 1 at 310, R. Doc. 13-10, at 23. Incorporating language like what Union Pacific had suggested, the plaintiffs defined the class as "[a]ll individuals who have been or will be subject to a fitness-for-duty examination as a result of a reportable health event." App. Vol. 1 at 310, R.

---

[2] At one point, Union Pacific stated that it produced this list of 7,723 employees on "February 26, 2017." *See* App. Vol. 1 at 276–78, R. Doc. 13-5, at 14–16. But that appears to be a typo: Elsewhere in the same document, the company recognized that the list was produced on "February 26, 2018." *See* App. Vol. 1 at 278, R. Doc. 13-5, at 16.

Doc. 13-10, at 23. That definition, the plaintiffs explained, was intended to "match" "the list of over 7,000 individuals that [Union Pacific] identified in discovery" because "[t]he company represented on multiple occasions that these were the individuals who had been 'subject to a Fitness for Duty Evaluation related to a Reportable Health Event' and that this was the list of class members." App. Vol. 1 at 332, R. Doc. 13-11, at 3.

The plaintiffs also made clear that, for purposes of defining the class, Union Pacific's "reportable health events policy" was not just limited to the conditions listed in the company's Medical Rules but broader than that—applying also, for instance, "to certain prescription drugs, and other conditions that are deemed to pose an increased risk for sudden incapacitation." App. Vol. 1 at 295–97, R. Doc. 13-10, at 8–10. The plaintiffs noted that "[t]hese additional drugs and conditions are also specifically identified in policy documents," including Union Pacific's list of "Restricted Prescription Drugs"—which includes Xanax. App. Vol. 1 at 297, R. Doc. 13-10, at 10; *see* App. Vol. 1 at 8, R. Doc. 1, at 8 (including Xanax on that list).

On behalf of this class, the plaintiffs pursued a "disparate treatment" claim—that Union Pacific's fitness-for-duty program discriminated against people with disabilities in violation of sections 12112(a) and (b)(6) of the ADA, both by discriminating in the terms and conditions of employment and by employing facially

discriminatory standards and criteria that screened them out of the workforce. *See* App. Vol. 1 at 310–12, R. Doc. 13-10, at 23–25.

Within this proposed class were a range of workers with different conditions, all of whom were subjected to Union Pacific's fitness-for-duty program and ultimately suspended from their jobs for having, what the company viewed as, reportable health events or conditions. That included workers who, like the named plaintiff Harris, had long been diagnosed with conditions like epilepsy. *See* App. Vol. 1 at 58–59, R. Doc. 8-1, at 8–9. It also included workers who, like the named plaintiff Baker, suddenly began to experience isolated bouts of lightheadedness. *See* App. Vol. 1 at 59–61, R. Doc. 8-1, at 9–11. And it included workers who, like named plaintiff Zinn, were put through a fitness-for-duty evaluation because Union Pacific learned they were taking Xanax—Mr. Hess among them. *See* App. Vol. 1 at 65–66, R. Doc. 8-1, at 15–16.

**3.** On February 5, 2019, the district court certified the *Harris* plaintiffs' proposed class. *Harris,* 329 F.R.D. at 628. Adopting the class definition put forth by the plaintiffs, the district court held that the six named plaintiffs were adequate class representatives whose claims were "typical of the class" and "arise[] from the same event or course of conduct as the class claims." *Id.* at 624. And lest there be any doubt about who was in the class the court was certifying, it "approve[d]" the sending of "notice to the" "class list" "given to plaintiffs by Union Pacific . . . identif[ying] a

13

total of 7,723 current and former employees"—again, including among them Mr. Hess. *Id.* at 627–28.

That certification order was, however, short-lived. Union Pacific appealed the district court's decision to this Court, complaining that the certified class totaled "more than 7,000" workers who had experienced a "broad[] universe of conditions or events that led to a fitness-for-duty examination." App. Vol. 2 at 474, 488–89, R. Doc. 13-19, at 8, 22–23; *see* App. Vol. 1 at 388, R. Doc. 13-13, at 25; App. Vol. 1 at 456, R. Doc. 13-14, at 28. Indeed, Union Pacific claimed that this class was too unwieldy precisely because "[t]he sprawling class encompasses more than 7,000 former and current Union Pacific employees alleging discrimination in connection with hundreds of different jobs at the company based on thousands of different medical conditions." App. Vol. 1 at 436, R. Doc. 13-14, at 8; *see* App. Vol. 1 at 387, R. Doc. 13-13, at 24.

Union Pacific recognized that this "universe of conditions" covered those of the named plaintiffs, "including a pacemaker, epilepsy, cardiomyopathy, post-traumatic stress disorder and chronic substance abuse issues, and unexplained episodes of 'syncope' or lightheadedness." App. Vol. 2 at 484, R. Doc. 13-19, at 11; *see also* App. Vol. 1 at 384–86, 390-91, 399; R. Doc. 13-13, at 21–23, 27–28, 36 (describing how named plaintiff Zinn "suffers from post-traumatic stress disorder," "failed a

drug test," and was eventually "disqualified").[3] And the company argued that the case posed too many individualized questions on behalf of each of the "7,000-plus absent class members" precisely because the "7,000-plus class members in this case have a broad universe of medical conditions, including but not limited to heart disease, brain injury, post-traumatic stress disorder, vision loss, hearing loss, substance abuse, and epilepsy." App. Vol. 1 at 375, 386–389; R. Doc. 13-13, at 12, 23–26.

On March 24, 2020, this Court agreed with Union Pacific: It granted the company's request and decertified the class. *Harris v. Union Pac. R.R. Co.*, 953 F.3d 1030, 1033 (8th Cir. 2020).

---

[3] Although Mr. Zinn was initially sent to a fitness-for-duty evaluation because Union Pacific discovered he was taking Xanax, *see* App. Vol. 1 at 386, R. Doc. 13-13, at 23, he later suffered a cardiac event that led to another evaluation. But Union Pacific "cleared Zinn for the cardiac issue relatively quickly." App. Vol. 2 at 544–45, R. Doc. 13-20, at 45–46. Union Pacific, however, remained concerned about Mr. Zinn's prescription drug use and PTSD, which led it to initiate a fitness for duty evaluation based on these, non-cardiac-related concerns. App. Vol. 2 at 544–45, R. Doc. 13-20, at 45–46. This evaluation included placing "Zinn on a medical leave of absence pending a psychological evaluation and chemical dependency report," and led to his "disqualification" from working "for the Railroad in any capacity." App. Vol. 2 at 544–45, R. Doc. 13-20, at 45–46; *see* App. Vol. 1 at 308–09, R. Doc. 13-10, at 21–22.

## C. Shortly after the decertification of the *Harris* class, Mr. Hess files his own EEOC charge and his own ADA action.

Following that decertification order, Mr. Hess pursued individual relief. On April 17, 2020, less than a month after this Court's decision, he filed an individual discrimination charge with the EEOC. App. Vol. 1 at 11, R. Doc. 1, at 11. The EEOC completed its review on May 15, 2023, and Mr. Hess filed this action just three days later. App. Vol. 1 at 11, R. Doc. 1, at 11.

In his individual action, Mr. Hess alleged on his own the same discrimination claims the *Harris* class had pursued on his behalf. As in *Harris*, Mr. Hess alleged that Union Pacific's fitness-for-duty policy discriminated against him in violation of the ADA because it removed him from service "on the basis of disability" and because it involved "qualification standards, employment tests, or other selection criteria that screen[ed]" him, as "an individual with a disability," out of employment with the company. App. Vol. 1 at 11–12, R. Doc. 1, at 11–12. As a result, Mr. Hess brought two claims modeled on the first claim brought in *Harris*: a standard disparate-treatment claim under 42 U.S.C. § 12112(a) and a qualification standard claim under 42 U.S.C. 12112 § (b)(6)). App. Vol. 1 at 11–12, R. Doc. 1, at 11–12; *see* App. Vol. 1 at 71–72, R. Doc. 8-1, at 21–22.

Union Pacific moved to dismiss Mr. Hess's complaint. Union Pacific recognized that the filing of the *Harris* action *initially* tolled the claims of putative class members under the *American Pipe* tolling doctrine. But the company argued that

16

tolling "ceased" for Mr. Hess when the *Harris* plaintiffs moved for class certification. App. Vol. 1 at 33, R. Doc. 7, at 6. That was so, Union Pacific said, because the definition of the class the *Harris* plaintiffs sought to certify narrowed the class definition by tying the class members' fitness-for-duty exam to a reportable health event. App. Vol. 1 at 32, R. Doc. 7, at 5. Union Pacific argued that that definition excluded people like Mr. Hess even though the company had identified Mr. Hess as a member of the very class the *Harris* plaintiffs ultimately proposed, the district court certified a "class list" of "class members" with Mr. Hess's name on it, and Union Pacific's own filings with this Court in *Harris* repeatedly treated workers like Mr. Hess and all those on the class list as class members. *See* App. Vol. 1 at 275–278, R. Doc. 13-5, at 13–16; App. Vol. 1 at 375, 386–389, R. Doc. 13-13, at 12, 23–26; App. Vol. 2 at 477, R. Doc. 13-19, at 11.

The company arrived at that view by offering a newly discovered construction of the proposed class definition. According to Union Pacific, that definition excluded Mr. Hess because he didn't experience a "reportable health event" as the company defined the term in its medical rules. App. Vol. 1 at 32, R. Doc. 7, at 5. Even though Union Pacific had suspended him without pay and initiated a fitness-for-duty evaluation "upon learning that Hess was prescribed and taking Xanax," Union Pacific insisted that neither his prescription nor diagnosis was covered by the reportable event policy. App. Vol. 1 at 29, 32, R. Doc. 7, at 2, 5. The company also

argued that his prescription was not sufficiently "new" to be a "new diagnosis" or covered "recent event," rather he had been subjected to screening and removed from his position for reasons not captured by the class definition. App. Vol. 1 at 32, R. Doc. 7, at 5.[4]

In response, Mr. Hess explained that that view of *American Pipe* tolling erred twice over: It misapplied the class definition, which everyone in *Harris* understood as including Mr. Hess; and it misunderstood the point of *American Pipe* tolling, which doesn't turn on flyspecking the definition of a proposed class. App. Vol. 1 at 108–22, R. Doc. 12, at 14–25. Mr. Hess argued that his claims were timely because he had been a member of the *Harris* class. App. Vol. 1 at 112, R. Doc 12, at 18. Under the U.S. Supreme Court's decision in *American Pipe*, he explained, "the commencement of a class action suspends the applicable statute of limitations as to all asserted members of the class." App. Vol. 1 at 108, R. Doc 12, at 14 (quoting *American Pipe*, 414 U.S. at 554). That approach makes sense because the filing of the class action serves the same purpose that the filing of an individual action would: It provides a defendant with notice of the substantive claims being brought against it, thereby assuring that the

---

[4] Union Pacific incorrectly framed Mr. Hess's § 12112(b)(6) unlawful screening claim as a disparate impact claim. *See*, App. Vol. 1 at 36, R. Doc. 7, at 9. But the company was confused: Mr. Hess's claim is that Union Pacific violated the ADA's bar on disparate *treatment* by employing a facially discriminatory qualification standard. *See* App. Vol. 1 at 11–12, R. Doc. 1, at 11–12. Regardless, the district court did not reach this issue.

defendant is aware of those claims, and who may assert them, before "evidence has been lost, memories have faded, and witnesses have disappeared." App. Vol 1 at 108, R. Doc 12, at 14 (quoting *American Pipe*, 414 U.S. at 554). Any rule to the contrary would require plaintiffs to file vast numbers of redundant, independent suits—and thus be inconsistent with the efficiencies Rule 23 was supposed to secure. App. Vol. 1 at 110, 119, R. Doc. 12, at 16, 25.

That logic, Mr. Hess explained, applied with its typical force here. Mr. Hess was a member of the proposed *Harris* class when that case was first filed, as it was litigated, and up until the point at which this Court decided that the class should be decertified. App. Vol. 1 at 111–12, R. Doc. 12, at 17–18. Union Pacific thus was on notice that it might face his claims, and the values of Rule 23 were safeguarded by suspending any requirement that he file his own protective suit while the class action was pending. *See* App. Vol. 1 at 111–12, R. Doc. 12, at 17–18.

Moreover, Mr. Hess explained, Union Pacific's post-hoc parsing of the class definition is at odds with the *Harris* record. For example, although Union Pacific now claims a health condition must be "new" to be an encompassed by the company's "reportable health policy," "three of the six named plaintiffs (Harris, Miller and Mount)," all had "long-standing health condition[s]" with "no new, recent, or changed diagnosis." App. Vol. 1 at 116, R. Doc. 12, at 22. No one raised that as an issue throughout the entire *Harris* litigation because, as Mr. Hess alleged in his complaint,

19

"Union Pacific's Fitness-For-Duty and 'Reportable Health Events' policies are even broader in practice than the Medical Rules reflect." App. Vol. 1 at 115, R. Doc. 12, at 21 (quoting App. Vol. 1 at 3–4, R. Doc. 1, at 3–4).

The district court below nevertheless accepted Union Pacific's tolling theory. To reach that conclusion, the court zeroed in on the company's post-hoc parsing of its definition of a reportable health event. App. Vol. 2 at 604, R. Doc. 18 at 6. It noted that Union Pacific described its reportable health events policy in its medical rules, and that Mr. Hess's specific medical condition was not one of the conditions listed. App. Vol. 2 at 603–04, R. Doc. 18, at 5–6. And the court held that since being "prescribed and taking Xanax" was not a reportable health event as explicitly defined in those rules, Mr. Hess's experience did not satisfy the narrowed class definition. App. Vol. 2 at 603–04, R. Doc. 18, at 5–6. But in so holding, the court did not explain why everyone in *Harris* treated Mr. Hess as a putative class member if in fact he was not a class member at all. Nor did the court explain why Mr. Hess was excluded from the class for not having a reportable health event when Mr. Zinn, a named plaintiff, had a similar condition to Mr. Hess. Instead, the court insisted that Mr. Hess should have deduced the class definition that Union Pacific was now proffering and filed an individual EEOC charge, rather than believing that the class

action continued to preserve his rights. App. Vol. 2 at 603–05, R. Doc. 18, at 5–7. As a result, the court granted Union Pacific's motion to dismiss.[5]

## SUMMARY OF ARGUMENT

**I.A.** Under *American Pipe*, the filing of a class action suspends the applicable statute of limitations "as to all asserted members of the class who would have been parties had the suit been permitted to continue as a class action." 414 U.S. at 554. That is for two reasons. *First*, the filing of a class action satisfies the notice and fairness objectives of limitations periods as to all the members of the asserted class, equipping a defendant with all the "essential information" it needs to defend itself against the claims of the class and any of its members. *Id.* at 555. And *second*, a contrary rule would frustrate the objectives of Rule 23 by encouraging class members to file repetitious papers and motions to preserve their claims. *Id.* at 551.

---

[5] This is not the only case where Union Pacific has argued that an individual *Harris* class member's claim was not tolled under *American Pipe*. The company has made a similar argument in other circuits about plaintiffs who were also class members but who experienced different conditions. Union Pacific has even gone so far as to claim that two of the declarants that the *Harris* district court identified by name as class members, *see Harris*, 329 F.R.D. at 624 & n.3, were somehow never actually part of the certified class. The Fifth Circuit and the Ninth Circuit have recently heard oral argument in these cases. *Zaragoza v. Union Pacific*, No. 23-50194 (5th Cir. argued Mar. 6, 2024); *Donahue v. Union Pacific*, No. 22-16847 (9th Cir. argued Feb. 14, 2024); *Blankinship v. Union Pacific*, No. 22-16849 (9th Cir. argued Feb. 14, 2024); *DeFries v. Union Pacific*, No. 23-35119 (9th Cir. argued Feb. 14, 2024). A similar color-vision case has also been fully briefed in this Court. *See DeGeer v. Union Pacific*, No. 23-2625 (8th Cir.).

**I.B.1.** *American Pipe* applies straightforwardly here. When the *Harris* class action was commenced, the proposed class included everyone who, like Mr. Hess, was removed from service for reasons related to a fitness-for-duty evaluation.

**2.** Mr. Hess's inclusion in the class did not change over the course of the litigation. When Union Pacific urged the plaintiffs to narrow the scope of the proposed class, it produced a corresponding list of employees that included Mr. Hess. When the plaintiffs moved for class certification, they made clear that was the class they had in mind. When the district court certified the class, it did the same—it identified the list of class members with Mr. Hess's name on it as the "class list." And when Union Pacific appealed the class-certification order, it, too, treated workers like Mr. Hess as class members, complaining that their inclusion in the class was one reason it should be decertified.

**3.** Mr. Hess thus was entitled to *American Pipe* tolling until this Court decertified the class. Because he timely filed his EEOC complaint shortly after this Court ruled, and then filed this federal suit immediately after the EEOC's determination, his claim was timely as well.

**4.** The district court's holding to the contrary is not only wrong because it fails to understand who was in the class, but also because it fails to accept as true Mr. Hess's pleadings alleging that his experience was covered by the class definition.

**II.** The district court also erred because it employed the wrong approach to determine when *American Pipe* tolling ended. By ignoring what happened in the *Harris* litigation and instead attempting to decide who was included within the class based solely on its own effort to reverse-engineer the contours of the class definition, the court applied the wrong approach to reach the wrong result.

**A.** *First*, to the extent the district court believed that it was entitled to pick apart the class definition of its own accord, it was wrong. The court that actually presided over the *Harris* litigation explicitly found that Mr. Hess was a class member, and there was no justification for the district court in this case to deviate from that decision.

**B.** *Second*, *American Pipe* tolling has never turned on one party's post hoc assertion of who was in the class, or even a post hoc parsing of the class definition. Rather, determining whether *American Pipe* tolling applies requires asking a straightforward question: was it objectively reasonable for an absent class member to rely on the class representatives to protect their interests? Here, because the *Harris* district court and both parties told Mr. Hess he was part of the class, it was undoubtedly reasonable for someone in Mr. Hess's shoes to think the same.

**C.** *Third*, the district court's approach abandons the equities that *American Pipe* tolling guarantees. Under that approach, putative class members would be required to monitor class proceedings, track and parse changes in a class definition, and

affirmatively disregard statements of the parties and the district court indicating that they are and remain class members. But *American Pipe* explicitly divested class members of any duty to monitor a class suit. Imposing that duty on them anyway would invite the very multiplicity of filings that the doctrine is meant to avoid.

## STANDARD OF REVIEW

This Court "review[s] *de novo* a district court's dismissal for failure to state a claim, taking all facts alleged in the complaint as true." *Kelly v. City of Omaha, Neb.*, 813 F.3d 1070, 1075 (8th Cir. 2016). A motion to dismiss should be granted only if "it appears beyond doubt that the plaintiff can prove no set of facts which would entitle him to relief." *Trooien v. Mansour*, 608 F.3d 1020, 1026 (8th Cir. 2010). "In making this determination, [the Court] draw[s] all reasonable inferences in favor of plaintiffs." *Kelly*, 813 F.3d at 1075.

## ARGUMENT

**I.     Under *American Pipe*, Mr. Hess's suit is timely.**

**A.     For the last fifty years, *American Pipe* has entitled putative class members to the tolling of the statute of limitations on their claims until and unless the class is decertified.**

In *American Pipe & Construction Company v. Utah*, the U.S. Supreme Court set out a straightforward rule: "The commencement of a class action suspends the applicable statute of limitations as to all asserted members of the class who would have been parties had the suit been permitted to continue as a class action." 414 U.S.

at 554. For half a century, that rule has meant that, for every putative class member, the limitations period remains tolled until and unless "class certification is denied"— at which point "class members may" either "cho[o]se to file their own suits," or decide "to intervene as plaintiffs in the pending action." *Crown, Cork & Seal Co. v. Parker*, 462 U.S. 345, 354 (1983). The Court has repeatedly reaffirmed these basic principles. *See, e.g.*, *China Agritech, Inc. v. Resh*, 584 U.S. 732, 738–741 (2018); *Cal. Pub. Emps.' Ret. Sys. v. ANZ Sec., Inc.*, 582 U.S. 497, 509 (2017).

The reasons for that rule, *American Pipe* explained, are common sense. Statutes of limitations serve an important objective. They prevent plaintiffs from sitting on their rights, barring "the revival of claims that have been allowed to slumber until evidence has been lost, memories have faded, and witnesses have disappeared." *American Pipe*, 414 U.S. at 554. In doing so, they "assure fairness to defendants," *Burnett v. N.Y. Cent. R.R. Co.*, 380 U.S. 424, 428 (1965), and ensure that defendants are "on notice" of the claims they might face, *Crown, Cork, & Seal*, 462 U.S. at 352. At the same time, "considerations of fair notice to plaintiffs" support "protecting unwary litigants against the inadvertent loss" of their claims "through the running of the statute of limitations." *Menhorn v. Firestone Tire & Rubber Co.*, 738 F.2d 1496, 1500 n.3 (9th Cir. 1984). A statute of limitations, in other words, is not designed "as a trap for the unwary or unsophisticated." *Arch of Ky., Inc. v. Dir., Off. of Workers' Comp. Programs*, 556 F.3d 472, 482 (6th Cir. 2009).

Where an *individual* suit is concerned, these considerations generally mean that each claim must be filed within a set period of time from the offending conduct—unless "the interests of justice," such as a defendant's own role in delaying or concealing a claim, "outweigh[]" the general "policy of repose." *Burnett*, 380 U.S. at 428.

But when it comes to a class action, different logic kicks in. Once a class-action complaint has been filed, the "purpose of [a] limitation provision" has been satisfied not simply as to "the named plaintiffs," but also as to "*all* those who might subsequently participate in the suit." *American Pipe*, 414 U.S. at 551 (emphasis added). That is because, by filing the class-action complaint, the named plaintiff has taken care of the defendant's notice and fairness concerns, informing it "not only of the substantive claims being brought against [it], but also of the number and generic identities of the potential plaintiffs who may participate." *Id.* at 555.

This means that the defendant possesses the "essential information" to defend itself against each of the proposed claims—from the "subject matter" of "the prospective litigation" to its expected size and scope—before those claims become stale. *Id.* The defendant will, as a result, be well "aware of the need to preserve evidence and witnesses respecting the claims of all the members of the class." *Crown, Cork, & Seal*, 462 U.S. at 353. And the defendant won't be surprised when—should a class action prove untenable—it faces the class members' individual claims. *See id.*;

*Adams Pub. Sch. Dist. v. Asbestos Corp.*, 7 F.3d 717, 718–19 (8th Cir. 1993) (explaining why the *American Pipe* rule is "consistent with the purpose of statutes of limitation"). Accordingly, courts have found that "[t]he scope of a plaintiff's asserted class for tolling purposes is that class for which there was fair notice as to both the substantive claims and the number and generic identities of the potential plaintiffs that might participate in the judgment if the plaintiff's desired class was, in fact, certified." *Smith v. Pennington*, 352 F.3d 884, 893–94 (4th Cir. 2003).

Nor could putative class members "be accused of sleeping on their rights" if they declined to file their own protective intervention motions or competing suits. *Crown, Cork, & Seal,* 462 U.S. at 352. Indeed, requiring them to take those steps would "frustrate" the "principal function" of a class suit altogether by encouraging the "unnecessary filing of repetitious papers and motions"—the very "multiplicity of activity which Rule 23 was designed to avoid." *American Pipe*, 414 U.S. at 550–51; *see Odle v. Wal-Mart Stores, Inc.*, 747 F.3d 315, 320 (5th Cir. 2014) ("[T]he class action mechanism would not succeed in its goal of reducing repetitious and unnecessary filings if members of a putative class were required to file individual suits to prevent their claims from expiring if certification of the class is denied."). That is why Rule 23 "both permits and encourages class members to rely on the named plaintiffs to press their claims." *Crown, Cork, & Seal,* 462 U.S. at 352–53. And so, *American Pipe* held, class members are entitled to be thought of as "parties to the suit" for limitations

purposes "until and unless they receive[] notice thereof and cho[ose] not to continue." 414 U.S. at 551.

The *American Pipe* tolling rule is both broad and concrete. It applies whether or not putative class members are aware of the underlying class proceedings. *See American Pipe*, 414 U.S. at 553. It applies whether, following decertification, class members seek to intervene in the initial class action, or whether they instead opt to file their own individual suits. *Crown, Cork, & Seal*, 462 U.S. at 350. And it applies irrespective of "the substantive reason" for the denial of class certification—because any contrary approach would end up encouraging the very premature intervention that the rule was designed to avoid. *Bridges v. Dep't of Md. State Police*, 441 F.3d 197, 211 (4th Cir. 2006). Instead, the rule simply "tolls the limitations period on viable claims while the trial court determines the parameters of the class in any possible class action." *Anderson v. Unisys Corp.*, 47 F.3d 302, 308 (8th Cir. 1995).

### B. Mr. Hess's suit is timely because he was entitled to *American Pipe* tolling as a member of the *Harris* class.

*American Pipe*'s tolling rule applies here. As explained below, when Mr. Hess was subjected to a fitness-for-duty evaluation upon learning he was prescribed and taking Xanax, he became a putative member of the proposed class. Throughout the life of the class action, that never changed. And once the class was decertified and the limitations period began to run again, Mr. Hess was well within the allotted time when he filed an EEOC charge, and then a federal complaint, raising the same

claims that were the basis for the *Harris* class. He was therefore entitled to *American Pipe* tolling on those claims.

**1.** When the *Harris* class action was filed, the proposed class included Union Pacific employees who were removed from service after being subject to a fitness-for-duty exam because Union Pacific learned they were taking a medication Union Pacific put on its restricted list. *See* App. Vol. 1 at 67, R. Doc. 8-1, at 17 (describing the class as "[i]ndividuals who were removed from service over their objection, and/or suffered another adverse employment action . . . for reasons related to a Fitness-for-Duty evaluation"). That included Mr. Hess—once he too was required to undergo a fitness-for-duty evaluation after Union Pacific learned he was taking Xanax. Mr. Hess was a Union Pacific employee who "suffered [an] adverse employment action," as the class definition required. App. Vol. 1 at 67, R. Doc. 8-1, at 17. He was removed from his position and faced onerous work restrictions that prevented him from working for the company. App. Vol. 1 at 8–9, R. Doc. 1, at 8–9. And he suffered those consequences for "reasons related to a Fitness-for-Duty evaluation": "Union Pacific immediately held Hess out of work without pay and initiated a Fitness-For-Duty evaluation upon learning that he was prescribed and taking Xanax," and, ultimately, imposed "permanent work restrictions" that "could not be accommodated." App. Vol. 1 at 8, R. Doc. 1, at 8.

Under *American Pipe*, Mr. Hess was entitled to rely on the filing of the *Harris* class action to toll the statute of limitations on his claim. The filing of *Harris* informed Union Pacific of the nature of the claim against it, and of the identities of the class members whose claims it had reason to expect—including Mr. Hess himself. *See American Pipe*, 414 U.S. at 551. Union Pacific was thus equipped with all the "essential information" it needed to defend itself against his claim. *Id.* at 555. And Mr. Hess, for his part, was entitled to rely on the filing of the class suit to preserve his claim, without any duty to "take note of the suit" or to "exercise any responsibility with respect to it." *Id.* at 552.

**2.** Throughout the *Harris* litigation, that didn't change. The class always included workers like Mr. Hess.

As an initial matter, that was true at all times between the filing of the complaint and the filing of the motion to certify the class. For instance, during discovery, Union Pacific objected again and again to the potential scope of the plaintiffs' initial proposed class. *See* App. Vol. 1 at 155–57, R. Doc. 13-2, at 3–5; App. Vol. 1. at 275–78, R. Doc. 13-5, at 13–16; App. Vol. 1 at 260–61, R. Doc. 13-4, at 4–5; App. Vol. 1 at 171–77, 190–95, 220, 229, 234, 250–54, R. Doc. 13-03, at 13–19, 32–37, 62, 71, 76, 92–96. The company insisted that the plaintiffs narrow their proposed class definition—specifically, that they focus on workers who faced the fitness-for-duty process for reasons related to, or that resulted in some way from, the types of medical

events or conditions the company viewed as "reportable health events." *See* App. Vol. 1 at 155–57, R. Doc. 13-2, at 3–5; App. Vol. 1 at 275–78, R. Doc. 13-5, at 13–16; App. Vol. 1 at 260–61, R. Doc. 13-4, at 4–5. And when the plaintiffs asked Union Pacific to identify all of those workers who would "fall within" what the company saw as the appropriate class definition, the company responded with a list "identifying" the "current or former Union Pacific employees subject to a Fitness for Duty Evaluation related to a Reportable Health Event." App. Vol. 1 at 260–61, R. Doc. 13-4, at 4–5; App. Vol. 1 at 275, 278, R. Doc. 13-5, at 13, 16. Mr. Hess was included on both the second and third (and final) iterations of that list. App. Vol. 1 at 284, R. Doc. 13-6, at 382; App. Vol. 1 at 287, R. Doc. 13-8, at 133.

Nor did the company ever once suggest, even as it urged the plaintiffs to adopt a narrower class definition, that doing so would exclude people like Mr. Hess. Just the opposite. Indeed, the reason the plaintiffs adopted the "reportable health event" language in the first place was because Union Pacific specifically suggested it described the experience of the named plaintiffs—including Mr. Zinn, who was similarly situated to Mr. Hess. When Union Pacific insisted that the plaintiffs in *Harris* narrow their proposed definition, it told them that "all of the factual allegations pled and the Named Plaintiffs' claims revolve around fitness-for-duty evaluations that were initiated because of a Reportable Health Event." App. Vol. 1 at 155, R. Doc. 13-2, at 3.

And that the class included workers like Mr. Hess remained true when the plaintiffs moved for class certification. The plaintiffs' motion adopted the class definition that Union Pacific had proposed, treating Union Pacific's final "list of over 7,000 individuals"—the very list that included Mr. Hess—as "the list of class members." App. Vol. 1 at 332, R. Doc. 13-11, at 4; App. Vol. 1 at 310, R. Doc. 13-10, at 23. The plaintiffs also specified that "all" of the six named plaintiffs, including Mr. Zinn, were "removed from service pursuant to Union Pacific's fitness-for-duty and reportable health events policy at issue in this litigation." App. Vol. 1 at 292, R. Doc. 13-10, at 4. They then summarized each of the relevant experiences of the named plaintiffs. For example, the plaintiffs noted that after "Mr. Zinn tested positive for Benzodiazepine [Xanax], and took medical leave to undergo treatment . . . UP refused to return him to work, requested medical information and testing, and subjected him to a fitness-for-duty evaluation." App. Vol. 1 at 308, R. Doc. 13-10, at 21. The company then "disqualif[ied] him from ever holding any position at UP." App. Vol. 1 at, 308, R. Doc. 13-10, at 21.

The district court's order certifying the class likewise explicitly recognized that Mr. Hess was a class member. *Harris*, 329 F.R.D. 616. It certified a "class list" of employees "given to plaintiffs by Union Pacific" that "identify a total of 7,723 current and former employees that are on this *class list*." *Id.* at 627 (emphasis added). And in holding that each of the six named plaintiffs were adequate class representatives, it

determined that each of their claims was "typical of the class" and "arises from the same event or course of conduct as the class claims." *Id.* at 624.

And once the *Harris* district court certified a class made up of the list of employees that Union Pacific produced—notwithstanding its prior arguments against certifying that class list—Union Pacific recognized that that list had become the class list. In fact, Union Pacific appealed the district court's decision to this Court precisely because, it asserted, the class was too capacious since it included those "more than 7,000" workers who had experienced a "broad[] universe of conditions or events that led to a fitness-for-duty examination." App. Vol. 2 at 474, 488–89, R. Doc. 13-19, at 8, 22–23; *see* App. Vol. 1 at 388, R. Doc. 13-13, at 25; App. Vol. 1 at 456, R. Doc. 13-14, at 28. The company emphasized that "[t]he sprawling class encompasses more than 7,000 former and current Union Pacific employees alleging discrimination in connection with hundreds of different jobs at the company based on *thousands* of different medical conditions." App. Vol. 1 at 436, R. Doc. 13-14, at 9; *see* App. Vol. 1 at 387, R. Doc. 13-13, at 24. And Union Pacific explicitly recognized that the "universe of conditions" these "7,000-plus class members in this case have . . . include but [are] not limited to heart disease, brain injury, *post-traumatic stress disorder*, vision loss, hearing loss, substance abuse, and epilepsy." App. Vol. 1 at 375, 388–89, R. Doc. 13-13, at 12, 25–26 (emphasis added). Union Pacific thus not only explicitly recognized that the class included the "more than 7,000" workers on the

class list, but also that it included individuals with the exact medical condition that Mr. Hess had, and that the "class members[']" relevant health conditions were not just limited to those Union Pacific's medical rules listed. *See, e.g.*, App. Vol. 1 at 27, R. Doc. 1-1, at 13.

Finally, as examples of why the class was too broad to be properly certified, Union Pacific pointed to the experiences of the named plaintiffs to argue that the class included too "vast [a] universe of medical conditions." App. Vol. 1 at 384–386, 389–391, 399, R. Doc. 13-13, at 21–23, 26–28, 36. One of those examples was Mr. Zinn who, like Mr. Hess, also "suffers from post-traumatic stress disorder" and was disqualified from service after the company learned that he was using Xanax to treat his condition. App. Vol. 1 at 386, R. Doc. 13-13, at 23; *see* App. Vol. 2 at 544–45, R. Doc. 13-20, at 45–46.

**3.** That makes this an easy case. As a member of the *Harris* class, Mr. Hess was entitled to *American Pipe* tolling from the moment he experienced the class-wide discrimination—since the class complaint had then already been filed—up until the moment the Eighth Circuit decertified the class. *See Crown, Cork, & Seal,* 462 U.S. at 354 (explaining that, "[o]nce the statute of limitations has been tolled, it remains tolled for all members of the putative class until class certification is denied"); *Vaught v. Showa Denko K.K.*, 107 F.3d 1137, 1147 (5th Cir. 1997) (explaining "the *American Pipe* rule applied to all potential class members"). He filed his EEOC complaint less than a

month after the Eighth Circuit decertified the class. App. Vol. 1 at 11, R. Doc. 1, at 11. And after the EEOC finished its investigation, Mr. Hess filed his federal complaint almost immediately—well within the 90 days the agency allowed. App. Vol. 1 at 11, R. Doc. 1, at 11. His claim was thus timely, and he should have been allowed to pursue it.

**4.** And Mr. Hess's claim would have been timely even if the class definition had left some ambiguity as to whether he was in the class. That is because his complaint here alleged that the discrimination he experienced fell within the class definition. On a motion to dismiss, that allegation must be taken as true. *Kelly*, 813 F.3d at 1075 ("[This Court] review[s] *de novo* a district court's dismissal for failure to state a claim, taking all facts alleged in the complaint as true."); *McCaffree Fin. Corp. v. Principal Life Ins. Co.*, 811 F.3d 998, 1002 (8th Cir. 2016) ("In making this determination, [the Court] must draw all reasonable inferences in favor of plaintiffs."). Although the district court recognized that it was required to take Mr. Hess's "factual allegations as true," it nonetheless held that his complaint "asserts he was . . . *not* a member of the second Harris class." App. Vol. 2 at 604, R. Doc. 18, at 6 (emphasis added). The district court was mistaken; Mr. Hess alleged exactly the opposite—that the class definition encompassed the discrimination he experienced. App. Vol. 1 at 3, R. Doc. 1, at 3.

35

In his complaint, Mr. Hess alleged that the term "Reportable Health Event" as used in the class definition in *Harris* covers a broader set of health conditions than just those listed in Union Pacific's medical rules. App. Vol. 1 at 3, R. Doc. 1, at 3 ("Union Pacific's Fitness-for-Duty and 'Reportable Health Events' policies are even broader in practice than the Medical Rules reflect."). He explained that Union Pacific's health policies were expanded "[i]n 2016 [when] Union Pacific created a list of medications employees were restricted from taking. Xanax, a Benzodiazepine, was on that list." App. Vol. 1 at 8, R. Doc. 1, at 8. And he specifically alleged that he was subject to Union Pacific's Fitness-For-Duty evaluation and was included within the class definition when the company learned that he was "prescribed and taking" a restricted medicine, Xanax. App. Vol. 1 at 8, R. Doc. 1, at 8. According to his complaint, that made him a "class member in the *Harris* case," and meant his "disability discrimination claims have been subject to tolling during the pendency of litigating the class-wide claims." App. Vol. 1 at 10, R. Doc. 1, at 10.

Given all of this, the district court erred not just in misinterpreting the *Harris* record but also in rejecting the well-pled facts in the complaint and failing to grant Mr. Hess the reasonable inferences he was due on a motion to dismiss.

## II. The district court's contrary logic distorts *American Pipe* tolling beyond all recognition.

To bar Mr. Hess's claim, the district court set aside this lengthy history and the straightforward tolling principles that the Supreme Court announced in *American*

*Pipe*. The district court did not point to anything that anyone in *Harris* had said or done to indicate an intent to exclude from the class everyone who, like Mr. Hess, was routed into the fitness-for-duty program for taking a medication that the company had restricted. Instead, it opted to parse the definition of the class the district court in *Harris* certified to come up with its own preferred understanding. It noted that Union Pacific described its reportable health events policy in its medical rules, and that Mr. Hess's specific medical condition was not included in those medical rules. App. Vol. 2 at 603–05, R. Doc. 18, at 5–6. And it decided that, because the medical rules did not technically define being "prescribed and taking Xanax" as a reportable health event, Mr. Hess could not be considered a class member within the definition of the certified class in *Harris*. App. Vol. 2 at 603–04, R. Doc. 18, at 5–6.

This was error twice over. *First*, it misapprehends who was in the certified class. If the court had faithfully considered what actually happened in *Harris*, it would have understood that the district court in *Harris* unambiguously included Mr. Hess in the class it certified. *Second*, the district court was wrong to treat *American Pipe* tolling as turning not on the history of the *Harris* litigation, but instead on a later court's own best guess of how the class definition might apply to individual plaintiffs. The "*American Pipe* rule" does not "vary based on the individual equities invoked by each former, putative class member." *Barryman-Turner v. D.C.*, 115 F. Supp. 3d 126, 133

(D.D.C. 2016). Rather, it turns on whether it was objectively reasonable for an absent class member to rely on the named class members to protect his interest. *See Bridges*, 441 F.3d at 210–11. The interests *American Pipe* safeguards are not served by the district court's approach to tolling, and Mr. Hess's claims should have been deemed timely here.

### A. The court below failed to recognize that the *Harris* district court defined the certified class to include Mr. Hess and those like him.

Begin with the district court's flawed understanding of who was included in the certified class. The district court was wrong to ground Mr. Hess's entitlement to *American Pipe* tolling on its own view about how to best apply the *Harris* class definition to Mr. Hess's declaration. The availability of *American Pipe* tolling has never turned on the decision of a new court—one that was a stranger to the initial class proceedings—to pick apart a class definition and conclude that, under some technical, heretofore unexamined nuance, a particular plaintiff wasn't included.

When classes are certified, the court that makes the certification decision determines the scope of a certified class. *See* Fed. R. Civ. P. 23(c)(1)(B) ("An order that certifies a class action must define the class and the class claims."); *Anderson*, 47 F.3d at 308 ("The *American Pipe* rule . . . tolls the limitations period on viable claims while the trial court determines the parameters of the class."). And the court that *was* charged with determining who was in the *Harris* class—and, in turn, who can avail

themselves of *American Pipe* tolling—was crystal clear that Mr. Hess, and those like him, were part of the class. *Harris*, 329 F.R.D. 616. Three key features of the court's class certification decision show why.

The first is the class list. The district court in *Harris* explicitly designated the list with Mr. Hess's name on it as the "class list" for the class it certified. *Harris*, 329 F.R.D. at 621, 627. The court recognized that the plaintiffs had refined the class definition when they "move[d] to certify the class." *Id.* at 621. And in granting the plaintiffs' request to certify that class, the court specified that the class it was certifying—using the class definition that included the "reportable health event" phrasing—included the "7,723 current and former employees that are on this class list" that Union Pacific "produc[ed]." *Id.* at 627. The court thus described those more than 7,000 workers as the "putative class members." *Id.* at 622–23. And, once the class was certified, the court "approve[d] the sending of notice to Union Pacific's entire 7,723-person "class list"—including Mr. Hess himself. *Id.* 627–28; *see* App. Vol. 1 at 287, R. Doc. 13-8, at 133. Under any reasonable reading of the district court's class certification order, the class the court certified included all of those on the "class list"—including Mr. Hess.

Second, consider that the district court in *Harris* never tied, or otherwise restricted, the class definition to Union Pacific's medical rules. That much is clear from the court's class certification opinion. In that opinion, the court made no

mention of—not even once—Union Pacific's medical rules. Nor did it even hint that those rules somehow played a role in defining who was included within the class. Instead, it recognized that those on the class list it certified had a reportable health event under the court's definition. *See id.* at 624 (noting those "7,000 Union Pacific employees that have had to report a health event under the new policy" in finding Rule 23's typicality requirements were met).

Finally, the court also explicitly recognized that a named plaintiff with the same health condition that triggered Mr. Hess's duty-for-fitness exam was part of the class. The court held that each of the six named plaintiffs were "typical of the class" and that they "experienced the discrimination alleged herein." *Id.* Those named plaintiffs included Mr. Zinn, a war veteran with PTSD, who alleged he was sent to a fitness-for-duty exam because Union Pacific discovered—just as it had with Mr. Hess—that he was taking Xanax. *See* App. Vol. 1 at 65–66, R. Doc. 8-1, at 15–16; App. Vol. 1 at 308–09, R. Doc. 13-10, at 21–22. And although Mr. Zinn's heath event was not technically covered by Union Pacific's medical rules, the court found that Mr. Zinn's claims fit within the class definition because he alleged the relevant discrimination and was "affected by the same policy." *Harris,* 329 F.R.D. at 624. There was thus nothing about Mr. Zinn's—or Mr. Hess's—experience that excluded them from the class that the district court certified.

Despite this clear instruction from the *Harris* district court about who was in the class it was certifying, the district court here ignored that directive. In doing so, it impermissibly second-guessed class membership in *Harris* and, in the process, overrode the views of both the parties and the court that was actually charged with certifying the class in *Harris*.

**B.** ***American Pipe* tolling extends as far as an absent class member could reasonably rely on the class action to preserve his rights, and here the district court and parties represented that Mr. Hess remained part of the class until decertification.**

There is a second, equally fundamental problem with the district court's approach. *American Pipe* tolling does not turn on one party's post hoc assertion of who was in the class or even a later parsing of the class definition. Rather, the relevant question for tolling purposes is straightforward: was it objectively reasonable for an absent class member to rely on the class representatives to protect his interest? Here, because the *Harris* district court, the plaintiffs, and the defendant all told Mr. Hess he was a part of the class, it was undoubtedly reasonable for someone in Mr. Hess's shoes to believe that he was, and therefore to rely on the named plaintiffs to protect his interests.

*American Pipe*'s tolling rule is broad. It applies to "all those who might subsequently participate in the suit," including all "asserted member[s]" of the class. *American Pipe*, 414 U.S. at 551–52. To this end, the Supreme Court has explained that

41

tolling is "permissible" for any absent class member who "reasonably relied on the class representative, who sued timely, to protect their interests in their individual claims." *China Agritech, Inc.*, 584 U.S. at 743 (citing *American Pipe*, 414 U.S. at 554–555, and *Crown, Cork, & Seal*, 462 U.S. at 350). And, consistent with this understanding, the Court has also explained that tolling ends when an absent class member "has no reason to assume that their rights [a]re being protected." *Taylor v. United Parcel Serv., Inc.*, 554 F.3d 510, 520 (5th Cir. 2008) (citing *American Pipe*, 414 U.S. 538 and *Crown, Cork, & Seal*, 462 U.S. 345). That makes sense. Any contrary rule requiring an absent class member to accurately predict the outcome of a class action based on "such subtle factors as experience with prior similar litigation or the current status of a court's docket" to ensure their claim is protected, "would breed needless duplication of motions." *American Pipe*, 414 U.S. at 533–54.

The Fourth Circuit has helpfully described this approach as the "reasonable class member rationale"—it asks whether someone in the shoes of an absent class member "could reasonably have" thought they were part of the class. *Bridges*, 441 F.3d at 211–12. And to answer that question, the Fourth Circuit explained, a court must first look to what the district court that was charged with the class certification decision told absent class members about who was in the class. *See id.* at 211–12. And if the class certification decision "did not adequately alert class members by its language alone," "the ensuing conduct of the litigation"—including what the

"representative parties told the absent class members" about class membership—

informs a decision about who is covered by *American Pipe* tolling. *Id.* at 211–13; *see also*

*Sawtell v. E.I. du Pont de Nemours & Co.*, 22 F.3d 248, 253–44 & 253 n.11 (10th Cir. 1994)

(looking to the "motivation of the class action plaintiffs in defining the class" for

"evidence supporting the inference [that a later plaintiff] was a putative member of

the class"); *Pennington*, 352 F.3d at 891–93 (noting that, for "purposes of determining a

party's entitlement to tolling," courts "consider evidence outside of the complaint

that demonstrates the extent of the class the plaintiff represented to the district court

that he desired to have certified" and who parties had "assum[ed]" was in the class).

Under this standard, "tolling extends as far as is justified by the objectively

reasonable reliance interests of the absent class members." *Bridges*, 441 F.3d 197 at 210–

11 (citing *Crown, Cork, & Seal*, 462 U.S. at 353–54).

Other circuits have recognized much the same thing. They, too, focus on what

an objectively reasonable absent class member would have understood when

determining the extent of *American Pipe* tolling. *See, e.g.*, *Potter v. Comm'r of Soc. Sec.*, 9

F.4th 369, 377 (6th Cir. 2021) (observing that "[a] reasonable absent class member

would have seen Judge Thapar's order for what it was . . . [t]hus, the reasonable

reliance interests of the putative *Hughes* class members favor applying *American Pipe*

tolling to these circumstances"); *Giovanniello v. ALM Media, LLC*, 726 F.3d 106, 117–18

(2d Cir. 2013) (concluding that "the remote possibility of reversal of the district court's

denial of class status does not provide a basis for objectively reasonable reliance by individual plaintiffs"); *Armstrong v. Martin Marietta Corp.*, 138 F.3d 1374, 1381 (11th Cir. 1998) (en banc) (concluding "that continued tolling of the statute of limitations after the district court denies class certification is unnecessary to protect any *reasonable* reliance by putative class members on their former class representatives").

Had the district court below followed this commonly accepted approach, it would have easily understood that *American Pipe* tolling applies to Mr. Hess's claims. First, the actual class certification decision in *Harris* told Mr. Hess that he was part of the class. It explicitly said that the list with Mr. Hess's name on it was the "class list" for the certified class—using the refined class definition that included the "reportable health event" phrasing—and therefore contained the names of the "putative class members." *Harris*, 329 F.R.D. at 621–24, 627. And it also identified a named plaintiff with the same health condition that triggered Mr. Hess's duty-for-fitness exam as part of that class. *Id.* at 624. That's more than enough for an objectively reasonable person in Mr. Hess's shoes to think he was part of the class.

Even if that wasn't enough, moreover, the surrounding litigation would have erased any doubt. Here, the representations from both parties in *Harris* unambiguously confirms what the district court said: Mr. Hess and those like him were included in the certified class.

Start with the named plaintiffs. They explicitly represented that they intended to include Mr. Hess and those like him in the class. In their motion for class certification, they *asserted* that the list of "over 7,000 workers" with Mr. Hess's name on it was the "proposed class." App. Vol. 1 at 330, 332, R. Doc. 13-11, at 3, 5; *see* App. Vol. 1 at 310, R. Doc. 13-10, at 23; *see Zarecor v. Morgan Keegan & Co.*, 801 F.3d 882, 888 (8th Cir. 2015) ("[A] class action tolls statutes of limitations as to all asserted members of the class."). They explained they were refining the class definition to "match" that "list of over 7,000 individuals that [Union Pacific] identified in discovery." App. Vol. 1 at 332, R. Doc. 13-11, at 5. And in refining the definition, they specified that Union Pacific's "reportable health events policy"—a term used in the refined class definition—"also applies to certain prescription drugs" that are "specifically identified in" Union Pacific's list of "Restricted Prescription Drugs." App. Vol. 1 at 295–97, R. Doc. 13-10, at 8–10. That includes Xanax—the very drug that triggered Mr. Hess's duty-for-fitness evaluation. *See* App. Vol. 1 at 8, R. Doc. 1, at 8.

Union Pacific made similar representations. Once the class was certified, it confirmed that it too recognized that everyone on the class list was included in the class. *See* App. Vol. 1 at 436, R. Doc. 13-14, at 8 (Union Pacific agreeing that the certified class included that same group of "more than 7,000 current and former Union Pacific employees"); App Vol. 1 at 387, R. Doc. 13-13, at 24. Union Pacific also explicitly recognized that Mr. Zinn, the named plaintiff who had a similar health

45

condition to Mr. Hess, was a class member. *See* App. Vol. 1 at 384–86, 390–91, 399, R. Doc. 13-13, at 21–23, 27–28, 36. And it complained that the class posed too many individualized questions precisely because it included individuals with Mr. Hess's medical condition. *See* App. Vol. 1 at 375, 387–89, R. Doc. 13-13, at 12, 24–26 (arguing the class posed too many individualized questions on because the "7,000-plus class members in this case have a broad universe of medical conditions, including . . . post-traumatic stress disorder").

Finally, neither party's papers would have made much sense if they intended to tie the certified class's definition to a strict reading of Union Pacific's medical rules that excluded Mr. Hess—like the district court below found. If that was so, three of the six named plaintiffs would not have been a part of the class because they had no "new" diagnosis or event. *See* App. Vol. 1 at 58–63, R. Doc. 8-1, at 8–13 (detailing how Mr. Harris had a longstanding epilepsy diagnosis, Mr. Miller had a longstanding ventricular myopathy diagnosis, and Mr. Mount had a pacemaker for over 20 years); App. Vol. 1 at 32–33, R. Doc. 7, at 5–6 (Union Pacific arguing below that the class definition requires a "new, recent, or changed" condition). But that wasn't an issue during the *Harris* litigation because there was never an intention to limit the class in this way. Both parties recognized that the class definition was not so limited because the term "recent health event" covered conditions beyond those listed in the company's medical rules. *See, e.g.*, App Vol. 1 at 147–49, R. Doc. 13-1 at, 11–13 (Union

Pacific's former Chief Medical Officer noting that in practice the company's policies on reportable health events was broader than what the medical rules listed); App. Vol. 1 at 295–97, R. Doc. 13-10, at 8–10 (plaintiffs' motion stating similarly).

On their own, the *Harris* district court's statements and that of each of the parties representing that Mr. Hess was part of the class would have been enough for a plaintiff in his shoes to reasonably rely on the pending class action to preserve his claims. Viewed together, it was not only reasonable for him to so rely, but it would have been unreasonable for him to think anything else.

## C. The district court's reasoning unavoidably conflicts with the core objectives of the doctrine.

The district court's approach undermines the core objective of *American Pipe* tolling. Consider what the district court's approach would demand of people like Mr. Hess. He would have needed to closely monitor the progress of the *Harris* proceedings. And he would have needed to affirmatively disregard what each of the parties in Harris had said—that he personally appeared on the proposed class list; that a named plaintiff who was similarly situated was representative of the class; and that the inclusion of individuals with his medical condition was one of the reasons why the class was supposedly overbroad. And he would have needed to affirmatively disregard what the federal district court that actually presided over the class litigation told him—that, because he appeared on the class list along with other similarly

47

situated workers who were "class members," he was entitled to class notice. *Harris,* 329 F.R.D. at 624.

*American Pipe* has never required putative class members to anticipate these sorts of contingencies. To the contrary, as the Supreme Court observed nearly fifty years ago: Class members have no "duty to take note of" a pending class suit "or to exercise any responsibility with respect to it in order to profit from the eventual outcome of the case." *American Pipe,* 414 U.S. at 552. A putative member of the original class who is repeatedly informed of that status therefore certainly has no duty to question whether he is in fact a member.

To nevertheless deprive someone who had every reason to think he was a class member of *American Pipe* tolling would turn that doctrine on its head. At best, it would invite inefficiency, encouraging class members who are uncertain as to their class status to undertake the very "unnecessary filing of [protective] repetitious papers and motions" that *American Pipe* tolling was intended "to avoid." 414 U.S. at 550; *see Great Plains Tr. Co. v. Union Pac. R.R. Co.*, 492 F.3d 986, 997 (8th Cir. 2007) ("The *American Pipe* rule is designed to protect the federal procedural interest by preventing duplicative litigation from purported class members during the period that certification is pending."). And at worst, it would allow defendants to spring traps for unwary class members by misleading plaintiffs, courts, and the class about the effect of changes to a proposed class until it is too late to correct the mistake. *American Pipe*

48

tolling exists to prevent exactly this sort of confusion, and it should have been applied here.

## CONCLUSION

The district court's judgment should be reversed.

Respectfully submitted,

*/s/ Matthew W.H. Wessler*
MATTHEW W.H. WESSLER
Gupta Wessler LLP
2001 K Street, NW
Suite 850 North
Washington, DC 20006
(202) 888-1741
*matt@guptawessler.com*

JESSICA GARLAND
Gupta Wessler LLP
505 Montgomery Street, Suite 625
San Francisco, CA 94111
(415) 573-0336

JAMES H. KASTER
LUCAS J. KASTER
Nichols Kaster, PLLP
4700 IDS Center
80 South 8th Street
Minneapolis, MN 55402
(612) 256-3200

April 12, 2024                    *Counsel for Plaintiff-Appellant*

**CERTIFICATE OF COMPLIANCE**

This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because this brief contains 12,860 words excluding the parts of the brief exempted by Rule 32(f). This brief complies with the typeface requirements of Rule 32(a)(5) and the type-style requirements of Rule 32(a)(6) because this brief has been prepared in proportionally spaced typeface using Microsoft Word in 14-point Baskerville font. This brief and the corresponding addendum comply with the virus scan requirements required by Local Rule 28A(h)(2) and is virus-free.

April 12, 2024                                  */s/ Matthew W.H. Wessler*
                                                Matthew W.H. Wessler

**CERTIFICATE OF SERVICE**

I hereby certify that on April 12, 2024, I electronically filed the foregoing brief with the Clerk of the Court for the U.S. Court of Appeals for the Eighth Circuit by using the CM/ECF system. All participants are registered CM/ECF users and will be served by the appellate CM/ECF system.

/s/ Matthew W.H. Wessler
Matthew W.H. Wessler